***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner with some modifications.
 ***********
Accordingly, the Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. On the date of the alleged injury, the parties were bound by and subject to the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between plaintiff and defendant-employer, and defendant-employer employed three or more employees.
3. Fireman's Fund Insurance Company was the carrier on the risk.
4. Plaintiff's average weekly wage was $650.00, which yields a compensation rate of $433.33.
5. Plaintiff began working for defendant-employer on February 5, 1999.
6. Plaintiff has received all compensation to which he is entitled with respect to the injury to his left hand, including compensation for a fifteen percent permanent partial impairment rating to the left hand.
7. The following exhibits were stipulated into evidence as Stipulated Exhibit 1:
 (a) Medical records of Moses Cone Health System ("Moses Cone");
(b) Medical records of Dr. Elizabeth M. Meyerdierks;
(c) Medical records of Greensboro Radiology;
(d) Medical records of Dr. Frank J. Rowan;
(e) Medical records of Dr. Stan Wilson;
(f) Medical records of Dr. Ernesto M. Botero;
 (g) Medical records of Dr. Jeffrey C. Hooper/Dr. W. R. Stafford, Jr.;
(h) Medical records of Dr. Matthew A. Weingold;
(i) North Carolina Spine Center (Dr. Paul Suh);
(j) Wesley Long Hospital;
 (k) Piedmont Orthopedics (Dr. John W. Krege/Dr. John H. Dilworth);
 (l) Medical records of Dr. Philip C. Deaton/Dr. James R. Hirsch;
(m) Moses Cone Rehabilitation Center;
(n) Triad Pain Management Clinic (Dr. Phillips); and
(o) Greensboro Orthopaedic Center.
8. The issues before the Commission are:(i) whether plaintiff's back condition arose from plaintiff's compensable injury by accident on September 11, 1999; and (ii) if so, what compensation, if any, is due plaintiff?
 ***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
 FINDINGS OF FACT
1. Plaintiff is a fifty-two year old male with a two pack per day smoking history. On February 5, 1999, plaintiff was hired by defendant-employer as an assistant manager at David Parts Warehouse in Greensboro. In June 1999, plaintiff was promoted to manager. His job duties included taking calls, completing paper work, pulling orders and shipping them out, and general overseeing of the warehouse.
2. Prior to September 11, 1999, plaintiff had experienced significant problems with his back, left leg and left hip. In November 1987, plaintiff was seen by Dr. Stan Wilson, his primary care physician, with complaints of back pain that had progressed to his right leg and later the left leg. Plaintiff's condition did not improve and he experienced increasing pain and inability to walk.
3. Plaintiff was subsequently seen by Dr. Ernesto M. Botero, a neurosurgeon, on July 27, 1988. Dr. Botero's diagnosis was chronic myofascial pain.
4. On November 8, 1997, plaintiff again began to experience back pain that radiated down his left leg after he tried to pick up heavy equipment. He was seen by Dr. Wilson on December 2, 1997 and then referred back to Dr. Botero. An MRI of plaintiff's spine on December 3, 1997 revealed a large left extroforaminal disc protrusion at L4-5 with significant nerve root encroachment, posterior element hypertrophy and central bulging of the annular fibers at L4-5, and posterior element hypertrophy at L5-S1 with central bulging annular fibers. On December 9, 1997, Dr. Botero performed a diskectomy at L4-5 and decompression of the L5 nerve root. Following this surgery, plaintiff continued to experience pain in his lower back and left leg. On March 12, 1998, Dr. Botero prescribed additional medication for plaintiff's continuing complaints of pain.
5. On September 11, 1999, plaintiff was on a ladder trimming tree limbs at defendant-employer's warehouse when he was stung by wasps and fell to the driveway below. Plaintiff was subsequently seen at Moses Cone Hospital's emergency room, where x-rays of his left wrist, left hip and pelvis showed no fractures. Plaintiff had a bruise on his left hip area, and the emergency room physician's diagnosis was contusions to the left side. Plaintiff was given pain medication and Benadryl and released to return to work with no restrictions on September 13, 1999. Plaintiff returned to his regular job with defendant-employer on September 13, 1999.
6. On September 30, 1999, plaintiff was seen by his family physician, Dr. Wilson, with complaints of pain in his left hand. Plaintiff made no mention of any pain in his back, left hip, or left leg. In fact, plaintiff told Dr. Wilson that although he had been seen at Cone Hospital on September 11, 1999 for swelling of his hip after the fall, his hip was now "o.k.".
7. Dr. Wilson referred plaintiff to Dr. Matthew A. Weingold, an orthopedic surgeon, who evaluated him on October 1, 1999 for complaints of left palmar pain in the area of the fourth and fifth digits. No other complaints were noted and plaintiff told Dr. Weingold he was on no medications. X-rays revealed a fracture of the hook of the hamate process of the left hand.
8. On November 9, 1999, at the direction of the carrier, plaintiff was seen by Frank J. Rowan, M.D., at Guilford Orthopaedic and Sports Medicine Center. On a review of systems checklist completed in Dr. Rowan's office, plaintiff indicated he was not having any problems with pain, numbness, weakness, or stiffness in his hips, legs, or back. He also indicated he was taking no medications.
9. On November 11, 1999, at the direction of the carrier, plaintiff was seen by Elizabeth Meyerdierks, M.D., an orthopedic surgeon. Plaintiff told Dr. Meyerdierks he was not taking any pain medications, and a review of systems was negative. Plaintiff's only complaint was pain in the left hand, and he made no complaints about his back, hip or leg. Dr. Meyerdierks diagnosed a fractured left hamate. On November 12, 1999, the hook of hamate was excised. Plaintiff returned to work on November 16, 1999.
10. In November 1999, plaintiff spoke with Sunny McClish, an adjuster with Fireman's Fund. Ms. McClish specifically asked plaintiff about his hip, and plaintiff stated other than just being sore, he was okay. Plaintiff did not ask to see a physician for his hip, leg, or back at any time during his many conversations with Ms. McClish regarding treatment for his left hand.
11. On January 4, 2000, plaintiff was seen by Dr. Meyerdierks for a postoperative follow-up visit. Plaintiff did not mention any complaints of pain in his back, hips or leg during this office visit. No problems with plaintiff's back, legs or hips were documented as being observed by Dr. Meyerdierks. Between January 4, 2000 and April 6, 2000, plaintiff neither sought nor received any treatment from any physician for any reason.
12. On April 6, 2000, plaintiff was seen by Dr. Weingold for complaints of hand weakness and irritability of the ulnar nerve distribution. Dr. Weingold did not document any reported or observed problems with plaintiff's back, hip or leg. Dr. Weingold ordered physical therapy for plaintiff's left hand, twice per week for four weeks. Plaintiff attended physical therapy sessions on April 11, 13, 18, 25, and 27 and on May 2. No documentation was made of any reported or observed problems with plaintiff's left hip, leg or back during these sessions. Plaintiff cancelled two physical therapy appointments in May because of alleged problems with his back.
13. In April 2000, plaintiff, for the first time, contacted Sandra Riley, the employer's benefits representative, about pain in his back, hip, and left leg. Between September 11, 1999 and April 2000, plaintiff spoke with Ms. Riley at least twenty times, keeping her informed about doctors' appointments and his status with regard to his hand injury. He never, however, told her about any problems with his back, hip or leg until April 2000. Ms. Riley suggested that plaintiff notify the carrier. On April 25, 2000, plaintiff notified Ms. McClish at Fireman's Fund about his back, hip and leg pain and requested an authorized doctor's visit for those complaints. Due to the eight month delay since the September 11, 1999 accident, such authorization was denied. Plaintiff admitted it was not until this April 2000 conversation that he notified the carrier of any alleged back, hip, or leg problems.
14. Plaintiff testified the reason he did not seek treatment for his alleged back, hip, and leg complaints until April 2000 was because he did not have help at work in order to leave the warehouse and that he was required to open the doors every morning. However, plaintiff's co-employees, Keavin Harrison and Gail Presnell, testified they and others covered for plaintiff when he missed work due to vacation or physician and therapy visits for his hand. Given this testimony, and the extensive medical treatment plaintiff received for his hand during this time period, plaintiff's testimony regarding the alleged reason for his failure to seek treatment for his back, hip, and leg complaints is not accepted as credible.
15. On May 2, 2000, plaintiff sought treatment from Dr. Wilson for left sciatic nerve pain. Dr. Wilson referred plaintiff to Dr. John H. Dilworth, an orthopedic surgeon. When seen by Dr. Dilworth on May 3, 2000, plaintiff indicated the pain in his left hip and leg began in January of 2000. An x-ray of the lumbar spine revealed facet arthropathy at L4-5. Dr. Dilworth stated that plaintiff was suffering from nerve root compression and probable recurrent herniated nucleus pulposus at L5-S1.
16. On May 17, 2000, an MRI of the lumbar spine revealed a focal left disc herniation at L5-S1 with associated mass effect on the left nerve root, degenerative disc disease with left sided foraminal stenosis at L4-5, the site of the prior 1997 surgery, and mild degeneration at L2-3 and L3-4 with associated mass effect. At the time of this MRI scan, plaintiff reported his back and leg pain did not begin until January of 2000.
17. On May 23, 2000, plaintiff told Dr. John Krege, Dr. Dilworth's partner, that his left hip and low back pain began developing gradually in January 2000. Dr. Krege's diagnosis was a large herniated disc at L5-S1, status postoperative diskectomy at L4-5. On May 31, 2000 Dr. Krege performed a left microdiscectomy at L5-S1, removing a very large herniated disc. Dr. Krege stated in his deposition that because of the size of the herniated disc and the tight nerve root, he believed that the herniation developed within a short time prior to the surgery. Dr. Krege also stated that the large herniated disc would have caused lots of symptoms and therefore it was "hard to tie in the date of the fall with the final discectomy."
18. Following surgery, plaintiff continued to experience pain in his back and left leg. Over the course of the next three months, plaintiff was treated by Dr. Krege with steroids and pain medication. Dr. Krege also strongly encouraged plaintiff to stop smoking. Plaintiff underwent additional MRI scans, myelograms, and CT scans.
19. On July 11, 2000, Dr. Krege performed an L5 hemilaminectomy on the left with diskectomy at L5-S1 and two level nerve root exploration and decompression (L4-5 and L5-S1). On July 31, 2000, plaintiff complained to Dr. Dilworth of continued pain in the left buttock and down into the posterior side of the left leg to the knee. Again steroids were started, and plaintiff was encouraged to stop smoking. On August 16, 2000, Dr. Krege told plaintiff he did not know the etiology of plaintiff's pain and referred him to Phillip C. Deaton, M.D., a neurosurgeon.
20. On August 21, 2000 Dr. Deaton recommended a repeat myelogram and CT scan, which revealed a broad based disc protrusion with a left lateral herniation component of the L4-5 disc resulting in severe narrowing of the left sided neural foramen and also of the lateral recess; prominence of the facet joints bilaterally with asymmetric separation of the left sided facet joint at L4-5; broad based disc bulge at L3-4 extending into the neural foramina bilaterally associated with mild facet arthropathy; right paracentral disc bulge at L2-3 extending into the right lateral recess; and mild facet arthropathy bilaterally at L2-3.
21. On August 29, 2000, Dr. James R. Hirsch, Dr. Deaton's associate, recommended an MRI scan and physical therapy. Dr. Hirsch also told plaintiff he would not do a fusion procedure unless plaintiff quit smoking. After reviewing the results of the MRI, Dr. Hirsch stated the best option for improvement of plaintiff's condition was a fusion at L4-5, the level of plaintiff's 1997 surgery by Dr. Botero. On September 6, 2000, Dr. Hirsch again told plaintiff to quit smoking prior to any surgical intervention. Plaintiff continues to smoke.
22. Plaintiff was subsequently seen by Dr. Jeffrey Hooper, a family practitioner, on September 19, 2000 for complaints of low back pain. Dr. Hooper's impression was that plaintiff was suffering from sacroiliitis and muscle strain, and he prescribed pain medications. Dr. Hooper later referred plaintiff to Dr. Paul B. Suh, an orthopedic surgeon in Chapel Hill.
23. Dr. Suh saw plaintiff on December 18, 2000. His impression was lumbar degenerative disc disease and lumbar spinal stenosis. Dr. Suh started plaintiff on Neurontin and physical therapy. Plaintiff continues to be followed by Dr. Hooper for his complaints of low back, hip and leg pain.
24. Between September 11, 1999 and May 16, 2000, plaintiff continued to work for defendant-employer, and did not miss any time from work due to his alleged hip, leg and back complaints. Plaintiff has not worked since May 16, 2000. He received his regular salary from the employer until the end of August 2000, and his medical expenses have been paid by his group insurance. Plaintiff has not looked for other work or applied for any other jobs.
25. Plaintiff testified at the Deputy Commissioner hearing that he began to have pain in his left hip and left leg immediately after his fall on September 11, 1999, and that his symptoms gradually increased to the point that by December 1999, he was experiencing severe pain and limitations. Several co-workers also testified that plaintiff began experiencing limitations as a result of his hip and leg pain prior to January 2000. Keavin Harrison, however, testified that it was not until two or three months prior to May 2000, when plaintiff went out of work, that plaintiff began complaining of problems with his back, hip, and leg.
26. After having the opportunity to observe all the witnesses at the hearing, the Deputy Commissioner did not find plaintiff's witnesses credible and gave greater weight to the testimony of defendants' witnesses. The Full Commission declines to reverse the credibility determination of the Deputy Commissioner.
27. Plaintiff has had significant problems with his back and spine since at least 1997, which have resulted in chronic, recurring low back, left hip and left leg pain. An MRI scan on December 3, 1997 revealed significant degenerative disc disease, including posterior element hypertrophy at L5-S1 with central bulging annular fibers. Plaintiff underwent surgery by Dr. Botero at L4-5 in 1997, but continued to experience low back and left leg pain after that surgery. Plaintiff suffers from multiple preexisting and ongoing degenerative conditions in his back, including facet hypertrophy, neural foraminal narrowing, recurrent disc protrusions, spinal stenosis, and bone spur formation.
28. To the extent that Dr. Dilworth, Dr. Krege or Dr. Hooper offered any opinions finding a causal connection between plaintiff's current back conditions and the September 11, 1999 incident, the doctors later retracted those opinions, which were based on the inaccurate assumption that plaintiff's symptoms had been ongoing since the incident. When Dr. Hooper, Dr. Dilworth, and Dr. Krege were given an accurate history, including plaintiff's failure to report any back, hip, or leg pain to his employer, the carrier, or any physician until April 2000, none of these physicians could offer an opinion to any reasonable degree of medical probability as to any causal connection between plaintiff's back condition and the fall on September 11, 1999. Therefore, the Commission finds that plaintiff failed to prove by the greater weight of the medical evidence that his back condition is causally related to the compensable injury by accident.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. While plaintiff did sustain an injury by accident arising out of and in the course of his employment on September 11, 1999, it resulted only in a left hamate fracture and self-limiting contusions. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff did not sustain any injury to his back, spine, left hip, or left leg as a proximate result of the incident on September 11, 1999. The back conditions for which plaintiff has received treatment from Drs. Wilson, Dilworth, Krege, Deaton, Hirsch, Suh, and Hooper, including a large disc herniation at L5-S1 and recurrent low back and left leg pain, were not caused or materially aggravated by the incident on September 11, 1999. N.C. Gen. Stat. § 97-2(6).
3. Plaintiff failed to sustain his burden of proving by the greater weight of the competent, credible evidence that he has been disabled either in whole or in part as a proximate result of the incident on September 11, 1999. Therefore, plaintiff is not entitled to any compensation for disability. N.C. Gen. Stats. §§ 97-29, -30, -31.
4. Plaintiff is not entitled to any medical compensation, and defendants shall not be responsible for any medical treatment of plaintiff's back and related conditions. N.C. Gen. Stat. § 97-25.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Under the law, plaintiff's claim must be, and the same is hereby, DENIED.
2. Each side shall bear its own costs.
This the ______ day of February, 2002.
 S/_____________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
S/_____________________________ CHRISTOPHER SCOTT COMMISSIONER
S/_____________________________ THOMAS J. BOLCH COMMISSIONER
LKM/mhb